OPINION. Tietjens, Judge: We are convinced that the petitioner changed the character of its business during the base period years within the intent of section 722 (a) and (b) (4) of the Internal Revenue Code.[1] The essential nature of the change was a conversion from the manufacture of all-rubber balls which can be characterized as playthings, to the building of rubber-covered fabric carcass balls of a quality and durability suitable for use in official athletic contests. This brought about a “difference in the products” within the scope of subparagraph (4). In this change the petitioner experienced unusual and abnormal expenses and losses during the development stage in replacing or repairing balls which proved defective in usage by customers and in reselling customers who, because of these defects had become dissatisfied with the performance of the balls purchased. Because of these abnormal costs and sales difficulties the earnings from the new products had not reached a normal level by the end of the base period and the actual base period net income was an inadequate standard of normal earnings. The respondent contends that there was no essential difference in the products, that the petitioner built footballs and basketballs prior to the base period and that the fabric carcass balls were merely improved products of the same type, built for the same purpose and serving the same markets. In addition, the respondent argues that the petitioner had to improve its balls to stay in business and meet competition, and that the addition of softballs and tennis balls to its line of goods is not sufficient to amount to a change in the products within the meaning of the statute. We think the evidence establishes that the rubber-covered fabric carcass, inflated balls were a new product, made by different manufacturing methods, offered for sale in a different market and at a considerably higher price, and in competition with official athletic balls of other manufacturers not previously competitors, and that this new product materially affected the petitioner’s earnings. These were not mere improvements in the line previously built by the petitioner. They were a departure from that line. The petitioner and Webb originated the rubber-covered inflated athletic ball of the caliber for use in high class play. The petitioner’s balls were sold in competition with leather-covered balls of Spalding, Wilson, and Goldsmith and could be sold at a lower price. The petitioner’s rubber-covered balls proved longer lasting than the leather-covered balls and were in demand by schools and recreational groups to which their lower price and greater durability were important considerations. The rubber-covered softball was a product first built in 1935, immediately prior to the base period. The petitioner experienced difficulties in its development, had a number of rejections, replaced many of those sold in the early years and did not develop a satisfactory softball until 1938. Some excessive costs were incurred on this account in 1936, 1937, and 1938 and possibly in 1939 which we consider to be abnormal and which tended to render the actual earnings of those years an inadequate standard of normal earnings. The respondent concedes that “camelback” was a new product to the petitioner and that a reconstruction of earnings is warranted on that account, but asserts that a reconstruction based upon that factor alone will not give a constructive average net income equal to the average computed under section 713 (f). The parties have agreed that the sales of camelback would not have been higher than actual 1939 sales had the petitioner commenced its manufacture 2 years earlier. The respondent also concedes that tennis balls, manufactured for the first time in late 1939, were a new product, but contends that the addition of a single product to a variety line, where some items are added from time to time and others dropped, does not amount to a change in character of the business for purposes of section 722 (b) (4). Nonetheless we think the petitioner is entitled to have the introduction of this item to its line taken into consideration in reconstructing its average base period net income. The parties agree that actual sales of other items manufactured were normal during the base period years. The petitioner’s sporting goods sales in 1937 were double the 1936 sales. In 1938, the first year of sales of the new fabric carcass balls, the sales volume was nearly double that for 1937. In 1939, however, there was a slight falling off, which the petitioner, and based on the record we think properly, attributes to loss of customers who found goods to be defective. In the first 9 months of 1940, the trend of sporting goods sales was again upward, as sales for 9 months were approximately equal to sales for the year 1939. This indicates that a normal level of sales had not been reached by the end of 1939. The petitioner has presented computations which it contends support its conclusion that a fair and just amount representing normal earnings to be used as a constructive average base period net income is not less than $83,969.53. This compares with averages of $44,265.25 as to 1941 and $54,357.01 as to other years computed under section 713 (f) and allowed by the respondent. The respondent has presented a computation which, he argues, shows that if the petitioner’s production difficulties reduced its total earnings by as much as 25 per cefit, the constructive earnings would be $48,000, less than the $54,357 average allowed under the growth formula of section 713 (f). The respondent further objects to the petitioner’s assumptions and computations as depending upon the recollection of one witness and without support by records or other evidence. The witness, Thomas Edkins, was purchasing agent and secretary-treausrer of the petitioner. He was employed by the petitioner’s predcessor from 1924 and by the petitioner from its inception. He is a registered mechanical engineer, and had much to do with the experimentation and development leading to the production of the fabric carcass balls and softballs. He was familiar with the lines of rubber goods manufactured by the petitioner. He had assisted in preparing the petitioner’s claims for relief under section 722, the first of which were filed in 1943 and which were based upon his recollection in 1943 of the facts in the base period years. The petitioner kept no records of returned merchandise, but made replacements out of stock or made repairs the cost of which was absorbed in the cost of goods sold. Edkins’ recollection is the best available evidence of the quantities of returns and the cost of replacements or repairs. Even though it may be inaccurate in some particulars, it merits consideration. Edkins estimated that some 85,000 to 90,000 inflated balls were built and sold using the metal valve with the bicycle type of core, that at least 50 per cent of these were returned as defective, that 75 per cent of the returned balls were repaired and the remainder were replaced. Repairs cost about 25 cents per ball and replacement with a “second” quality ball cost 75 to 80 cents each. Edkins also estimated that in 1938 some 35,000 to 50,000 Duro-Cord balls were built and that over 50 per cent of them were returned as defective due to fractured carcasses. Some of these were returned by dealers or picked up by the petitioner’s agents prior to retail sale. These balls could not be repaired. They were at first replaced with another Duro-Cord ball at a cost of about $2, later replacements were made with fabric balls at a factory cost of 75 cents to $1 exclusive of packaging and delivery. Edkins made an estimate as to the cost of replacing softballs, stating that some 90,000 to 100,000 were built in each year, that from 25 to 40 per cent were found to be defective, that the cost of replacement was about 40 to 45 cents each. On the basis of these estimates the petitioner computes the cost of repairing or replacing balls in 1938 and 1939 as follows: [[Image here]] We do not have to accept these estimates as being accurate to know that there were abnormal costs of some considerable degree in those years. Witnesses testified that a normal volume of returns of this type of athletic goods on account of defects would not exceed 2 per cent of sales, and that returns of 25 to 50 per cent were clearly abnormal. One of the purposes of the 2-year rule was to permit taxpayers to overcome losses incurred in the initial development of a new or changed business and to establish within an assumed additional 2 years a normal earnings level. E. P. C. S. 5 and 6, 1946-2- C. B. 122, 123. The petitioner’s reconstruction presents several diffiulties. It uses a graphic projection of sales of sporting goods from the 1936 figure through the 1939 figure and extended for 2 years to reach $380,000. This makes use of figures for 1936 and 1937, which were prior to the sales of the fabric carcass balls and are of little meaning in ascertaining the normal sales level of such balls. If we accept the petitioner’s premise that the drop in sales in 1939 was due to rejections of merchandise and that an increased future volume was predictable at the end of that year, we still have to guess at the prospective rate of increase to estimate the normal level to be reached in two additional years of theoretically normal operations. The reported offer of Spalding, Wilson, and other manufacturers in 1938 to accept up to $500,000 worth of athletic goods from the petitioner in a year would indicate a substantial unfilled demand, but no contract was effected and the failure to reach an agreement has not been explained. The petitioner’s reconstruction of expenses compares 1938 and 1939 figures with 1940 figures and in so doing violates the statutory prohibition against consideration of post-1939 events in a reconstruction. The figures of sales of inflated balls alone show a downward trend in 1939 as compared with 1938, as do also figures of sporting goods and of net profits. We think it is reasonable to assume that had the manufacture of the fabric carcass balls commenced 2 years earlier, the problems of initial production would have been solved, the abnormal costs would have been reduced or eliminated, and a normal level of earnings would have been reached by the end of 1939. This level would have been considerably higher than that actually attained. We have considered the trend of sales of the petitioner’s new products, the probable level such sales would have reached had the change in products occurred 2 years earlier, and the ratio of normal expenses, after elimination of abnormal items, to sales and have found that $60,000 is a fair and just amount representing normal earnings to be used as a constructive average base period net income. The parties have stipulated that the excess profits credit for the taxable years involved is to be determined by making reductions on account of net capital reductions under section 713 (A) (1) (c) of the Internal Revenue Code in the amount of $833.04 for the fiscal years ended in 1942 to 1946. No such reduction is required as to the fiscal year ended in 1941. The parties have stipulated that the constructive average base period net income applicable for the taxable year ended in 1941 is to be reduced by 18 per cent representing the income tax adjustment required to be made in determining excess profits net income for the taxable year of the base period, under the law applicable for the taxable year ended in 1941. Reviewed by the Special Division. Decision will be entered under Rule 50. SEC. 722. (a) General Rule. — In any case in which the taxpayer establishes that the tax computed under this subehapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, * * .* (b) Taxpayers Using Average Earnings Method. — The tax computed under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on Income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this sub-paragraph, the term “change in the character of the business” includes a change In the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, • • •